REGISTER OF ACTIONS
VELVA L. PRICE
DISTRICT CLERK, TRAVIS COUNTY TEXAS

TIME:  03:45:08 PM
DATE:  Mar 31, 2016
PAGE:  1

D-1-GN-16-000907
      PARTY:

**NUTT V. TEXAS FARMERS INSURANC**

COURT/JUDGE: 419   419TH JUDICIAL DISTRICT COURT   STATUS:  PN   PENDING
FILING DATE: 03-02-2016   CASE TYPE:  DTP   DECEPTIVE TRADE PRACTICE
DATE CASE ENTERED: 03-02-2016
EVENT CATEGORY:
    PERIOD:      TO

| DATE | PARTY | EVENT | RECEIPT # | AMOUNT |
|------|-------|-------|-----------|--------|
| 03-02-2016 | PL 1 | ASM:GN CIVIL PETITION<br>    CICCONE ANTHONY | | $302.00 |
| 03-02-2016 | PL 1 | ASM:CITATION ISSUE<br>    CICCONE ANTHONY | | $8.00 |
| 03-02-2016 | PL 1 | ORIGINAL PETITION/APPLICATION<br><br>PLAINTIFFS ORIGINAL PETITION | | |
| 03-02-2016 | | NEW:ORIGINAL PETITION/APPL | | |
| 03-02-2016 | DF 1 | ISS:CITATION<br><br>Form Number P01-38222<br>Issued by RUBEN TAMEZ (4701) ISS:CITATION<br>E-WRIT ISSUANCE SENT TO PRIVATE PROCESSOR<br>sent to austin process | | |
| 03-02-2016 | PL 1 | PMT:GN CIVIL PETITION<br>    Received Of:  CICCONE ANTHONY<br>    Memo:  09386461 | L   163091 | $-302.00 |
| 03-02-2016 | PL 1 | PMT:CITATION ISSUE<br>    Received Of:  CICCONE ANTHONY<br>    Memo:  09386461 | L   163091 | $-8.00 |
| 03-21-2016 | DF 1 | EXECUTED SERVICE<br><br>CITATION-TEXAS FARMERS INSURANCE COMPANY | | |

I, VELVA L. PRICE, District Clerk,
Travis County, Texas, do hereby certify that this is
a true and correct copy as same appears of
record in my office. Witness my hand and seal of
office on _mann 31, 2016_

VELVA L. PRICE
DISTRICT CLERK
By Deputy:



3/2/2016 9:53:09 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-16-000907**
**Ruben Tamez**

Cause No. D-1-GN-16-00\_\_\_\_ 0907

| | | |
|---|---|---|
| Daryl Nutt, | § | In the District Court |
|       Plaintiff | § | |
| | § | |
| vs. | § | Travis County, Texas |
| | § | |
| Texas Farmers Insurance Company, | § | 419TH |
|       Defendant | § | \_\_\_\_\_ Judicial District |

## PLAINTIFF'S ORIGINAL PETITION

To The Honorable Court:

    Daryl Nutt, Plaintiff, files this Original Petition complaining of Texas Farmers Insurance Company, and in support thereof would show as follows:

### I. - Discovery Plan

1.    Discovery in this lawsuit is intended to be conducted under Level 2 as provided by Rule 190.3, Tex. R. Civ. P.

### II. - Parties

2.    Plaintiff is an individual residing in Hays County, Texas and may be contacted by and through the undersigned attorney.

3.    Defendant Texas Farmers Insurance Company is a domestic insurance company whose principal place of business is in Austin, Texas and may be served with process by serving its attorney for service, Chris Granger, at 15700 Long Vista Drive, Austin, Texas 78728.

### III. - Venue

4.    Plaintiffs will show that venue of this proceeding is proper in Travis County, Texas pursuant to Chapter 15 of the Tex. Civ. Prac. & Rem. Code.



## IV. - <u>Facts</u>

5.     <u>Contractual Agreement.</u>  On or about August 27, 2010, Plaintiff purchased the property

at 383 Placid Cove Drive, New Braunfels, Guadalupe County, Texas 78130 (the "Property").  On that

date, he signed a Deed of Trust ("the Agreement") as Borrower with Network Funding, L.P., d/b/a United

Lending, L.L.C ("Network Funding") acting as lender.  In the Deed of Trust, the parties agreed to certain

Uniform Covenants; specifically at issue, that mandatory flood insurance payments were an Escrow Item

to be paid out of the Escrow Funds to the Insurance Company by Network Funding. (*See* Deed of Trust

attached as Exhibit "A").

6.     <u>Flood Policy.</u>  Network Funding required Plaintiff to maintain flood insurance during

the course of the loan. (*See* Notice of Special Flood Hazards and Availability of Federal Disaster Relief

Assistance attached as Exhibit "B"). The original flood insurance was provided by Texas Farmers

Insurance Company, Policy No. 87027835882010, for the period of June 16, 2010 through June 16, 2011,

at an annual premium of $355.00. (*See* Texas Farmers Insurance Company Flood Policy Declarations

attached as Exhibit "C"). The Initial Escrow Account Disclosure Statement stated that the $355.00

insurance payment would be made by Network Funding from the escrow account in one lump sum

payment in the month of June. (*See* Initial Escrow Account Disclosure Statement attached as Exhibit

"D").

7.     The parties also agreed that if the flood insurance was not maintained by Plaintiff,

Network Funding could place collateral protection insurance ("Forced Insurance") on the property that

"may be considerably more costly" and "may not satisfy all needs you may have for property damage

coverage or any mandatory liability insurance requirements imposed by applicable law". (*See* Collateral

Protection Insurance Notice attached as Exhibit "E").



8. **Mortgage Paid through Automatic Monthly Bank Payments**. The Initial Escrow Account Disclosure Statement provided that Plaintiff's monthly mortgage payment for the year was $2,531.52. Of that amount, Network Funding was obligated to apply $1,674.84 to the principal and interest and $856.68 would be applied to Plaintiff's escrow account to pay the escrow items, including the mandatory flood insurance. (*See* Initial Escrow Account Disclosure Statement attached as Exhibit "D"). Plaintiff arranged for regular monthly payments by setting up an automatic withdrawal plan through his bank. Each month, $2,531.52 was withdrawn from his bank account.

9. **Assignment of Rights and Duties to Wells Fargo.** During October 2010, Plaintiff received a notice that Wells Fargo had purchased his mortgage from Network Funding. Since the purchase of Plaintiff's mortgage was an assignment of all the rights and obligations included under the original agreement between the parties, Wells Fargo assumed the obligation to pay the annual premium (from Plaintiff's escrow account) and otherwise maintain the original flood insurance policy pursuant to the terms of the original agreement.

10. Pursuant to the terms of the Agreement, Wells Fargo paid the $355.00 premium and maintained the flood insurance policy for coverage period of June 12, 2011 through June 12, 2012. After that policy period, although Plaintiff continued to pay the proper sums into the escrow account, Wells Fargo either failed to make the premium payments and maintain the policy or Texas Farmers Insurance Company failed to property renew the policy.

11. According to Wells Fargo, Farmers failed to renew the policy and/or send them a renewal policy, bill, or cancellation notice. Plaintiff never received any notices from Farmers either. Wells Fargo further asserted that when it called Farmers' agent, National Flood, Wells Fargo was refused all information and the opportunity to renew timely.

12. **The Grandfathering Rule**. Plaintiff's original policy was subject to the "grandfathering rule." When flood map changes occur, the National Flood Insurance Program (NFIP) provides a lower-

Page 3 of 7



cost flood insurance rate option known as "grandfathering." It is available for property owners who already have flood insurance policies in effect when the new flood maps become effective and then maintain continuous coverage. Because Farmers failed to renew the policy and/or send Wells Fargo or Plaintiff a renewal policy, bill, cancellation notice or any other kind of notice, Farmers intentionally caused the grandfathered policy to lapse. Farmers' refusal to provide notices and information to Wells Fargo and Plaintiff resulted in a failure to maintain the policy, despite Plaintiff's consistent payments to the escrow account for the same. There was no longer continuous coverage, and Plaintiff's policy was no longer "grandfathered." Such failures failure caused Plaintiff's premiums to skyrocket, and such premiums will remain unnecessarily high for the remainder of Plaintiff's ownership of the Property.

### V. - Deceptive Trade Practices Act Violation

13.    Farmers has violated the Texas Deceptive Trade Practices Act ("DTPA"), Chapter 17 of the TEXAS BUSINESS AND COMMERCE CODE. Farmers' acts, omissions and conduct as outlined above violate several sections of the DTPA which include but are not limited to Sections 17.46(b) (2), (12), (22), and (24) for the following reasons:

(i)    Farmers caused confusion or misunderstanding as to the source, sponsorship, approval, or certification of its services;

(ii)   Farmers represented that an agreement confers or involves rights, remedies, or obligations which it does not have or involve;

(iii)  Farmers represented that services had been performed when in fact they had not been; and

(iv)   Farmers failed to disclose information concerning services which was known at the time of the transaction.

In addition to the foregoing, Farmers' conduct was an unconscionable action or course of action entitling Plaintiff to relief under Tex. Bus. & Com. Code §17.50(a)(3).



14.     Farmers' conduct was committed knowingly and Plaintiff is entitled to three times the amount of economic damages pursuant to Tex. Bus. & Com. Code §17.50(b)(1).  Plaintiff is further entitled to court costs and reasonable and necessary attorneys' fees pursuant to Tex. Bus. & Com. Code §17.50(c).

## VI. - **Breach of Contract**

15.     Plaintiff will show that Farmers' failure to provide Wells Fargo and Plaintiff with notices and pertinent information about the Policy constitutes a breach of contract.  As a result of Farmers' breach of contract the Plaintiff has been harmed in an amount within the jurisdictional limits of this court.  Plaintiff is therefore entitled to his damages as alleged below as well as his attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code 38.001 *et seq.*

## VII. - **Damages**

16.     **Current Economic Damages.**  The difference between the Plaintiff's original premium on the grandfathered policy that Farmers caused to lapse ($355.00), and the Forced Insurance premium that Wells Fargo subsequently put in place as a result ($2,250.00) is $1,895.00.  At the time of filing this lawsuit, Plaintiff has current economic damages in the amount of $7,580.00 as summarized below:

|     | Policy Period | Difference between Premiums |
|-----|---------------|------------------------------|
| 1.  | June 16, 2012 – June 16, 2013 | $1,895.00 |
| 2.  | June 16, 2013 – June 16, 2014 | $1,895.00 |
| 3.  | June 16, 2014 – June 16, 2015 | $1,895.00 |
| 4.  | June 16, 2015 – June 16, 2016 | $1,895.00 |
|     | **Total** | **$7,580.00** |



17.    **Future Economic Damages.** The cost for coverage equivalent to the original policy is currently $6,793.00 which is $6,438.00 more than the $355.00 premium charged for his lapsed (and grandfathered) original policy. Plaintiff will therefore incur damages in this amount for each year beyond June 16, 2016 when his current policy expires for the remainder of his life and/or ownership of the Property. According to the Actuarial Life Tables obtained from the Office of the Chief Actuary, Social Security Administration, Mr. Nutt who is 41, should live at least another thirty-six years beyond June 16, 2016. The damages incurred each year ($6,438.00), multiplied by 36 years (Plaintiff's remaining years according to actuarial tables), results in future economic damages in the amount of **$231,768.00**. Plaintiff's current and future damages are within the jurisdictional limits of this court.

## VIII. - **Attorneys' Fees**

18.    Plaintiff seeks its reasonable and necessary attorneys' fees for services rendered through the trial of this matter, together with conditional awards of attorneys' fees in the event of appeal, pursuant to Tex. Bus. & Com. Code §17.50(c), and §38.001, et. seq., Tex. Civ. Prac. & Rem. Code.

## IX. - **Prejudgment Interest**

19.    Plaintiff prays for prejudgment interest on Plaintiff's actual damages as alleged above at the highest legal rate.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein and that upon final hearing, Plaintiff have the following relief:

1.    Judgment against the Defendant for Plaintiff's current and future actual damages;

2.  Judgment against the Defendant for additional damages pursuant to Tex. Bus. & Com. Code §17.50(b)(1);

3.  Judgment against the Defendant for Plaintiff's attorneys' fees, together with conditional awards of attorneys' fees in the event of appeal;

4.  Prejudgment and postjudgment interest at the highest legal rate;

5.  Costs of court; and

6.  Such other and further relief, general or special, at law or in equity, as to which Plaintiff may be justly entitled.

Respectfully submitted,

**KIESTER, LOCKWOOD & CICCONE, L.L.P.**
611 W. 14th Street, Suite 100
Austin, Texas 78701
Phone: (512) 477-5796
FAX: (512) 477-5821

By:     _/S/ Anthony F. Ciccone_
        Anthony F. Ciccone
        State Bar No. 24040692
        Amanda M. Bergstrom
        State Bar No. 24076271
        amanda@klclawyers.com
        ATTORNEY FOR PLAINTIFF

When Recorded Mail To:
NETWORK FUNDING, L.P., D/B/A UNITED LENDING,
L.L.C.
9700 RICHMOND AVENUE, SUITE 320
HOUSTON, TEXAS 77042

NUTT
Loan Number 616-9080302
Case Number 495-8869080-703
MIN 100056361690803025

---

[Spaces Above This Line For Recording Data]

## DEED OF TRUST

State of TEXAS

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

THIS DEED OF TRUST ("Security Instrument") is made on AUGUST 27, 2010. The Grantor is DARYL L. NUTT , A SINGLE PERSON ("Borrower"). The trustee is SCOTT R. VALBY, whose address is 1700 WEST LOOP SOUTH, SUITE 200, HOUSTON, TEXAS 77027 ("Trustee"). The beneficiary is MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") (SOLELY AS NOMINEE FOR LENDER, AS HEREINAFTER DEFINED, AND LENDER'S SUCCESSORS AND ASSIGNS). MERS IS ORGANIZED AND EXISTING UNDER THE LAWS OF DELAWARE, AND HAS AN ADDRESS AND TELEPHONE NUMBER OF POST OFFICE BOX 2026, FLINT, MICHIGAN 48501-2026, TELEPHONE, (888)679-MERS. NETWORK FUNDING, L.P., D/B/A UNITED LENDING, L.L.C., a limited partnership organized and existing under the laws of THE STATE OF TEXAS, and has an address of 9700 RICHMOND AVENUE, SUITE 320, HOUSTON, TEXAS 77042 ("Lender"). Borrower owes Lender the principal sum of THREE HUNDRED THIRTY THOUSAND FIVE HUNDRED FORTY-EIGHT AND 00/100ths Dollars (U.S.$330,548.00). This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on SEPTEMBER 1, 2040. This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under Paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to the Trustee, in trust, with power of sale, the following described property located in COMAL County, Texas:

Page 1 of 9
GV2003-1.NEW

FHA Texas Deed of Trust - 6/96



EXHIBIT



LOT 75 AND SECTION C1 OF LOT 76, RIVERBEND SUBDIVISION, UNIT 1, GUADALUPE COUNTY, TEXAS, ACCORDING TO MAP OR PLAT THEREOF RECORDED IN VOLUME 3, PAGE(S) 48, OF THE PLAT RECORDS OF GUADALUPE COUNTY, TEXAS

which has the address of   383 PLACID COVE DR.,                                                    NEW BRAUNFELS,
                                                   [Street]                                                                     [City]
Texas                          78130                      ("Property Address");
            [Zip Code]

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument; but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

   BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

   THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

   Borrower and Lender covenant and agree as follows:

   UNIFORM COVENANTS.

   1. Payment of Principal, Interest and Late Charge. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note.

   2. Monthly Payment of Taxes, Insurance, and Other Charges. Borrower shall include in each monthly payment, together with the principal and interest as set forth in the Note and any late charges, a sum for (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for insurance required under Paragraph 4. In any year in which the Lender must pay a mortgage insurance premium to the Secretary of Housing and Urban Development ("Secretary"), or in any year in which such premium would have been required if Lender still held the Security Instrument, each monthly payment shall also include either: (i) a sum for the annual mortgage insurance premium to be paid by Lender to the Secretary, or (ii) a monthly charge instead of a mortgage insurance premium if this Security Instrument is held by the Secretary, in a reasonable amount to be determined by the Secretary. Except for the monthly charge by the Secretary, these items are called "Escrow Items" and the sums paid to Lender are called "Escrow Funds."

Lender may, at any time, collect and hold amounts for Escrow Items in an aggregate amount not to exceed the maximum amount that may be required for Borrower's escrow account under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 et seq. and implementing regulations, 24 CFR Part 3500, as they may be amended from time to time ("RESPA"), except that the cushion or reserve permitted by RESPA for unanticipated disbursements or disbursements before the Borrower's payments are available in the account may not be based on amounts due for the mortgage insurance premium.

If the amounts held by Lender for Escrow Items exceed the amounts permitted to be held by RESPA, Lender shall account to Borrower for the excess funds as required by RESPA. If the amounts of funds held by Lender at any time are not sufficient to pay the Escrow Items when due, Lender may notify the Borrower and require Borrower to make up the shortage as permitted by RESPA.

The Escrow Funds are pledged as additional security for all sums secured by this Security Instrument. If Borrower tenders to Lender the full payment of all such sums, Borrower's account shall be credited with the balance remaining for all installment items (a), (b), and (c) and any mortgage insurance premium installment that Lender has not become obligated to pay to the Secretary, and Lender shall promptly refund any excess funds to Borrower. Immediately prior to a foreclosure sale of the Property or its acquisition by Lender, Borrower's account shall be credited with any balance remaining for all installments for items (a), (b), and (c).

3. **Application of Payments.** All payments under Paragraph 1 and 2 shall be applied by Lender as follows:

First, to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and

Fifth, to late charges due under the Note.

4. **Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss directly to Lender, instead of to Borrower and to Lender jointly. All or any part of the insurance proceeds may be applied by Lender, at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in Paragraph 3, and then to prepayment of principal, or (b) to the restoration or repair of the damaged Property. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments which are referred to in Paragraph 2, or change the amount of such payments. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

5. **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument (or within sixty days of a later sale or transfer of the Property) and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that requirement will cause undue hardship

Page 3 of 9
GV2003-3.NEW

FHA Texas Deed of Trust - 6/96



for Borrower, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall notify Lender of any extenuating circumstances. Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

6. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in place of condemnation, are hereby assigned and shall be paid to Lender to the extent of the full amount of the indebtedness that remains unpaid under the Note and this Security Instrument. Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order provided in Paragraph 3, and then to prepayment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments, which are referred to in Paragraph 2, or change the amount of such payments. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

7. **Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in Paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.

If Borrower fails to make these payments or the payments required by Paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement at the Note rate, and at the option of Lender shall be immediately due and payable.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

8. **Fees.** Lender may collect fees and charges authorized by the Secretary.

9. **Grounds for Acceleration of Debt.**

   (a) **Default.** Lender may, except as limited by regulations issued by the Secretary in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

FHA Texas Deed of Trust - 6/96



(i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

(ii) Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

(b) Sale Without Credit Approval. Lender shall, if permitted by applicable law (including section 341(d) of the Garn-St Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

(i) All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and

(ii) The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property, but his or her credit has not been approved in accordance with the requirements of the Secretary.

(c) No Waiver. If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

(d) Regulations of HUD Secretary. In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

(e) Mortgage Not Insured. Borrower agrees that if this Security Instrument and the Note are not determined to be eligible for insurance under the National Housing Act within sixty (60) days from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to sixty (60) days from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

10. Reinstatement. Borrower has a right to be reinstated if Lender has required immediate payment in full because of Borrower's failure to pay an amount due under the Note or this Security Instrument. This right applies even after foreclosure proceedings are instituted. To reinstate the Security Instrument, Borrower shall tender in a lump sum all amounts required to bring Borrower's account current including, to the extent they are obligations of Borrower under this Security Instrument, foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with the foreclosure proceeding. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument.

11. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time of payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successor in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this

FHA Texas Deed of Trust - 6/96



Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12. Successors and Assigns Bound; Joint and Several Liability; Co-Signers. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of Paragraph 9(b). Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

14. Governing Law; Severability. This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

15. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

16. Hazardous Substances. Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substances affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this Paragraph 16, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in the Paragraph 16, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

17. Assignment of Rents. Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to

FHA Texas Deed of Trust - 6/96



Lender's notice to Borrower of Borrower's breach of any covenant or agreement in this Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Paragraph 17.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

18. Foreclosure Procedure. If Lender requires immediate payment in full under Paragraph 9, Lender may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Paragraph 18, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give notice of the time, place and terms of sale by posting and recording the notice at least 21 days prior to sale as provided by applicable law. Lender shall mail a copy of the notice of sale to Borrower in the manner prescribed by applicable law. Sale shall be made at public venue between the hours of 10 a.m. and 4 p.m. on the first Tuesday of the month. Borrower authorizes Trustee to sell the Property to the highest bidder for cash in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying indefeasible title to the Property with covenants of general warranty. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

If the Property is sold pursuant to this Paragraph 18, Borrower or any person holding possession of the Property through Borrower shall immediately surrender possession of the Property to the purchaser at that sale. If possession is not surrendered, Borrower or such person shall be a tenant at sufferance and may be removed by writ of possession.

If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Paragraph 9, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 et seq.) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Paragraph 18 or applicable law.

19. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

FHA Texas Deed of Trust - 6/96



20. **Substitute Trustee.** Lender, at its option and with or without cause, may from time to time remove Trustee and appoint, by power of attorney or otherwise, a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by applicable law.

21. **Subrogation.** Any of the proceeds of the Note used to take up outstanding liens against all or any part of the Property have been advanced by Lender at Borrower's request and upon Borrower's representation that such amounts are due and are secured by valid liens against the Property. Lender shall be subrogated to any and all rights, superior titles, liens and equities owned or claimed by any owner or holder of any outstanding liens and debts, regardless of whether said liens or debts acquired by Lender by assignment or are released by the holder thereof upon payment.

22. **Partial Invalidity.** In the event any portion of the sums intended to be secured by this Security Instrument cannot be lawfully secured hereby, payments in reduction of such sums shall be applied first to those portions not secured hereby.

23. **Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

☐ Condominium Rider　　　　　　　☐ Growing Equity Rider

☒ Planned Unit Development Rider　　☐ Graduated Payment Rider

☐ Other(s)
　 [specify]

24. **Purchase Money; Vendor's Lien; Renewal and Extension; Manufactured Home Conversion.** [Complete as appropriate]
Vendor's Lien: The Note secured hereby is primarily secured by the Vendor's Lien retained in the Deed of even date herewith conveying the Property to Borrower, which Vendor's Lien has been assigned to Lender, this Deed of Trust being additional security therefore.

BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

..........................................(Seal)　　..........................................(Seal)
DARYL L. NUTT　　　　　　　　　 -Borrower　　　　　　　　　　　　　　　　　 -Borrower


..........................................(Seal)　　..........................................(Seal)
　　　　　　　　　　　　　　　　 -Borrower　　　　　　　　　　　　　　　　　 -Borrower


..........................................(Seal)　　..........................................(Seal)
　　　　　　　　　　　　　　　　 -Borrower　　　　　　　　　　　　　　　　　 -Borrower

FHA Texas Deed of Trust - 6/96



————————————— [Space Below This Line For Acknowledgment] —————————————

STATE OF TEXAS, .............................. COMAL ........ COUNTY ss:

This instrument was acknowledged before me this 27 day of AUGUST
20 10 , by DARYL L. NUTT .

My Commission Expires:

.....................................................
(Signature of Officer)
(Title of Officer)

**RENAY SMITH**
Notary Public
STATE OF TEXAS
My Comm. Exp. 06-03-2013

Page 9 of 9
GV2003-9.NEW

FHA Texas Deed of Trust - 6/96



NUTT
Loan Number 616-9080302
Case Number 495-8869080-703
MIN 100056361690803025

## NOTICE OF SPECIAL FLOOD HAZARDS AND
## AVAILABILITY OF FEDERAL DISASTER RELIEF ASSISTANCE

Property Address:   383 PLACID COVE DR, NEW BRAUNFELS, TEXAS 78130

The building or mobile home securing the loan for which you have applied is or will be located in an area with special flood hazards.

The area has been identified by the Director of the Federal Emergency Management Agency (FEMA) as a special flood hazard area using FEMA's Flood Insurance Rate Map or the Flood Hazard Boundary Map for the following community: NEW BRAUNFELS, CITY OF. This area has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year. During the life of a 30-year mortgage loan, the risk of a 100-year flood in a special flood hazard area is 26 percent (26%).

Federal law allows a lender and borrower jointly to request the Director of FEMA to review the determination of whether the property securing the loan is located in a special flood hazard area. If you would like to make such a request, please contact us for further information.

☒ The community in which the property securing the loan is located participates in the National Flood Insurance Program (NFIP). Federal law will not allow us to make you the loan that you have applied for if you do not purchase flood insurance. The flood insurance must be maintained for the life of the loan. If you fail to purchase or renew flood insurance on the property, Federal law authorizes and requires us to purchase the flood insurance for you at your expense.

* Flood insurance coverage under the NFIP may be purchased through an insurance agent who will obtain the policy either directly through the NFIP or through an insurance company that participates in the NFIP. Flood insurance also may be available from private insurers that do not participate in the NFIP.
* At a minimum, flood insurance purchased must cover the lesser of:
  (1) the outstanding principal balance of the loan; or
  (2) the maximum amount of coverage allowed for the type of property under the NFIP. Flood insurance coverage under the NFIP is limited to the overall value of the property securing the loan minus the value of the land on which the property is located.
* Federal disaster relief assistance (usually in the form of a low-interest loan) may be available for damages incurred in excess of your flood insurance if your community's participation in the NFIP is in accordance with NFIP requirements.

☐ Flood insurance coverage under the NFIP is not available for the property securing the loan because the community in which the property is located does not participate in the NFIP. In addition, if the non-participating community has been identified for at least one year as containing a special flood hazard area, properties located in the community will not be eligible for Federal disaster relief assistance in the event of a Federally-declared flood disaster.

By signing below, you acknowledge that you have received this notice.

_____   08/27/10          _____
DARYL L. NUTT                [Date]                          [Date]



EXHIBIT
B

POLICY #:   87027835882010

Presented by:
Flood Insurance Processing Center
P.O. Box 2057 Kalispell MT 57906-2157

To report a claim call: (888) 753-5666

 **FARMERS**

## Texas Farmers Insurance Company
## FLOOD POLICY DECLARATIONS

Policy Renewal

**TYPE: DWELLING**

POLICY PERIOD:   9/15/2010   to   9/15/2011        Preferred Risk

These Declarations are effective as of:        9/15/2010   at 12:01 AM

| INSURED NAME & ADDRESS | PRODUCER NAME & MAILING ADDRESS |
|---|---|
| STRICKLAND, BILLY | PRODUCER: 1348368 |
| KIMBERLY, KREDE | RANDALL KISSLING |
| 1164 BELICARY CIRCLE | 170 N FIRST ST |
| NEW BRAUNFELS, TX 78130-8524 | NEW BRAUNFELS, TX 78130-7819 |
|  | PHONE: (830) 625-9357 |
|  | Ref: 03511-01264-008 |

## POLICY INFORMATION

PREMIUM PAYOR:  1st Mortgagee          COMMUNITY NAME        COMMUNITY NUMBER
                                       GUADALUPE COUNTY *    480266 0050 B
INSURED PROPERTY ADDRESS                                    POLICY TERM:  One Year
369 BLACIS COVE DR
NEW BRAUNFELS, TX 78130-6951

| BUILDING DESCRIPTION | Coverage Limitations May Apply, Refer | CONTENTS LOCATION |
|---|---|---|
| Single Family | to your Standard Flood Insurance | Lowest Floor Above Ground |
| Two Floors | Policy for details. | Level, and Higher Floors |
| No Basement/Enclosure/Crawlspace | | |

PROGRAM                         FLOOD ZONE                  CONSTRUCTION

Regular                         C                           Post-Fire
                                                            Construction

## COVERAGE & RATING INFORMATION
### BUILDING                        CONTENTS                    PREMIUM PAID

| Coverage: | $250,000 | Coverage: | $100,000 | Premium Subtotal: | $335.00 |
|---|---|---|---|---|---|
| Deductible: | $1,000 | Deductible: | $1,000 | Previous Premium   Subtotal: | 0.00 |

                                                Federal Policy Fee:     $20.00
                                                Endorsement Amount:      0.00

                                                Total Premium:          $355.00

FIRST MORTGAGEE                 SECOND MORTGAGEE
PNC BANK NA
ISAOA ATIMA
PO BOX 1026
DAYTON, OH 45401-1026
Loan#: 0004654672

This Declarations Page, in conjunction with the policy, constitutes your Flood Insurance Policy.
IN WITNESS WHEREOF, we have signed this policy below and hereby enter into this Insurance Agreement.



Chief Operating Office          Secretary
Texas Farmers Insurance Company

INSURED COPY

9/26/2010
JR

CXP



EXHIBIT
C

Loan Number  616-9060382

# INITIAL ESCROW ACCOUNT DISCLOSURE STATEMENT

NETWORK FUNDING, L.P., D/B/A UNITED LENDING, L.L.C.
9700 RICHMOND AVENUE, SUITE 320
HOUSTON, TEXAS 77042

Toll-free/Collect number 713/334-1100

Your monthly mortgage payment for the coming year will be $ 2,531.52  of which $ 1,674.84  will be for principal and interest and $ 856.68  will go into your escrow account.

This is an estimate of activity in your escrow account during the coming year based on payments anticipated to be made from your account.

| Month | Payments to Escrow Account | Payments from Escrow Account | Description | Escrow Account Balance |
|---|---|---|---|---|
| Starting balance: | | | | $    5,677.63 |
| OCTOBER | 856.68 | 147.08 | FHA Premium | 6,387.73 |
| NOVEMBER | | | | |
| DECEMBER | 856.68 | 147.08 | FHA Premium | 7,506.43 |
| | | 5,397.23 | | 2,419.20 |
| JANUARY | 856.68 | 147.08 | FHA Premium | 3,128.80 |
| FEBRUARY | 856.68 | 147.08 | FHA Premium | 3,838.40 |
| MARCH | 856.68 | 147.08 | FHA Premium | 3,548.00 |
| APRIL | | | | |
| MAY | 856.68 | 147.08 | FHA Premium | 4,967.20 |
| JUNE | | | | |
| | | 344.00 | Flood Insurance | 5,321.80 |
| JULY | 856.68 | 147.08 | FHA Premium | 6,031.40 |
| AUGUST | 856.68 | 147.08 | FHA Premium | 6,741.00 |
| SEPTEMBER | 856.68 | 147.08 | FHA Premium | 5,677.62 |

(PLEASE KEEP THIS STATEMENT FOR COMPARISON WITH THE ACTUAL ACTIVITY IN YOUR ACCOUNT AT THE END OF THE ESCROW ACCOUNTING COMPUTATION YEAR.)

Cushion selected by servicer:$    1,419.20

Borrower  _____    Date  08/27/10          Borrower  _____    Date
DARYL L. NUTT

Borrower  _____    Date          Borrower  _____    Date





GV64499



Wells Fargo
P.O. Box 10335
Des Moines, IA 50306-0335

July 22, 2015

Amanda Bergstrom
Kiester, Lockwood & Ciccone, L.L.P.
611 West 14th Street
Austin, TX 78701-1725

Subject: Resolution to inquiry regarding customer, Daryl L. Nutt

Dear Ms. Amanda Bergstrom:

Thank you for the opportunity to address your inquiry regarding the lender placed flood insurance on Daryl Nutt's account. We've carefully researched this matter and are providing you with a response.

We have researched your concern and determined we were not at fault for the cancellation of the flood policy in 2012 regarding Daryl L. Nutt's mortgage account. We did not receive a renewal policy, bill or cancellation notice from the agent or the customer. We did make several calls to the insurance company, National Flood, and the agent to get the policy but no information was provided. We will not be compensating the customer, Daryl L. Nutt as there was no error made on our part.

I have provided the timeline below of the attempts, in which we tried to reach out to the insurance company, National Flood, the agent and/or the customer.

- June 28, 2012: We called National Flood Services and found out the policy number was invalid.
- July 02, 2012: We called National Flood Services and instructed to call the agent.
- July 03, 2012: We called the agent but kept getting a busy signal.
- July 11, 2012: We called the customer to let him know we need coverage to be provided to us.
- July 18, 2012: We received a call from the customer saying he needs his flood insurance paid; we advised him that we needed the policy.
- July 25, 2012: We received a call from the customer and we advised him we did not receive a policy. The customer told us he would contact the insurance company.
- August 14, 2012: We received a call from the customer; while the customer was on the line, we called the agent. We were advised the agent was with a customer and would call us back.
- August 24, 2012: We received a call from the customer; we advised him we did not receive a call back from the agent.
- September 06, 2012: We called the agent and she could not locate a new flood policy and the previous policy was cancelled in June of 2012.
- September 25, 2012: We received a call from the customer and we advised him that we still had not received a policy. We called the agent and she said she was still searching for a flood insurance company to cover the property.



Nutt
July 22, 2015
Page 02

- September 26, 2012: We received a call from the agent; she told us she found a company to cover the property but the premium was going to be much higher. She advised an elevation certificate might reduce the premium. We called the customer to provide him with this information and explained how he could get an elevation certificate.
- January 07, 2013: We received a call from the customer who wanted to discuss his flood insurance being cancelled for nonpayment. We advised him we never received a policy. We called the insurance company and told to call the agent. We called the agent and the agent advised this was not their customer.
- February 15, 2013: We received a call from the customer about the cancellation of the flood insurance being cancelled for nonpayment. We called the agent and the agent said the customer needed to call the city flood plain manager to obtain a letter that the map changed after his home was built. The agent said obtaining this letter may reduce the rate on the flood insurance.
- April 08, 2013: We called the customer to ask about the status of the new flood policy and he advised he was still working on it with the agent.
- May 13, 2013: We received a call from the customer asking for the policy number on his old flood policy, which we provided to him.
- August 19, 2013: We called the agent and she said they do not service the insurance for this customer.
- January 14, 2014: We received an email from the customer stating we caused his flood insurance to cancel for nonpayment. We explained to the customer he is responsible for making sure we receive the insurance bill and we never received a bill for the flood policy.
- January 17, 2014: We received a request from the customer to review his account regarding his flood policy being cancelled for nonpayment and his premium increasing due to no longer being in grandfather status. We reviewed the account and advised the customer a call was made on September 06, 2012 and was advised by agent, Judy, no active flood policy since June of 2012, and we were not listed on the policy. We advised the customer he needed a new carrier and to forward us the declaration's page.
- January 20, 2014: We received and email from the customer disputing lender placed flood coverage. We explained to him that it is his responsibility to secure coverage and to provide us with the billing information. We told our customer, as a courtesy, we tried via multiple contact methods and multiple sources to obtain the billing information without success. We also advised the customer at closing, he signed disclosures stating if he did not obtain flood coverage, lender is expressly authorized to obtain coverage on the customer's behalf. We exhausted all resources to assist the customer on this matter.
- May 13, 2014: We received a call from the customer disputing lapse charge/coverage. We advised the customer the last premium payment to the flood insurance company was June 07, 2011. We advised the customer we tried to contact the insurance company, National Flood, and the agent to get the policy renewal and we never received the information to pay the policy. We let the customer know we would research and review the account.



Nutt
July 22, 2015
Page 03

- May 14, 2014: We completed our review of the account and there was no error made on our part regarding the nonpayment of the flood policy. We were not provided a renewal or billing information. Attempted were made several times to obtain the policy information with the insurance company, National Flood Services and the agent. The customer did not provide renewals or billing information to us. We advised the customer that we had advised him on January 17, 2014 there was no error in the flood policy not being paid. We also advised the customer on September 06, 2012, we confirmed that we had not received any billing information.
- July 01, 2015: We reviewed this account for a second time and found we were not at fault for the flood policy to cancel June of 2012 for nonpayment. We were not provided a renewal policy, billing information or cancel notice or call requesting payment from the agent or the customer. We made several attempts to the insurance company and the agent to obtain policy information in which no information was provided.

To ensure no adverse information was sent to the consumer reporting agencies while we researched your concern, we placed a 60-day hold on any negative credit reporting for this account. We want you to know this hold will remain in effect until August 28, 2015, even though we've completed our research.

**Going forward**

If you have any questions about the information in this letter, please contact me directly at 1-800-853-8516, extension 57632. I am available to assist you Monday through Friday, 7:00 a.m. to 3:30 p.m. Central Time. If you require immediate assistance and I am unavailable, other representatives are available to assist you at 1-800-853-8516, Monday through Friday, 7:00 a.m. to 7:00 p.m. Central Time.

Sincerely,

Elizabeth Soderman
Executive Mortgage Specialist
Customer Care and Recovery Group

CC:    Daryl L. Nutt
       12701 Pheasant Run
       Buda, TX 78610-2531

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on   March 31, 2016

VELVA L. PRICE
DISTRICT CLERK
By Deputy:

EX003/1JZ/co1427878/ge3923545/cl708



C I T A T I O N

T H E   S T A T E   O F   T E X A S

**CAUSE NO. D-1-GN-16-000907**

3/21/2016 10:04:12 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-16-000907**
**Terri Juarez**

DARYL NUTT

, Plaintiff

vs.
TEXAS FARMERS INSURANCE COMPANY

, Defendant

TO:  TEXAS FARMERS INSURANCE COMPANY
     BY SERVING CHRIS GRANGER (ATTORNEY FOR SERVICE)
     15700 LONG VISTA DR
     AUSTIN, TEXAS 78728

Defendant, in the above styled and numbered cause:

**YOU HAVE BEEN SUED.  You may employ an attorney.  If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.**

Attached is a copy of the PLAINTIFFS ORIGINAL PETITION of the <u>PLAINTIFF</u> in the above styled and numbered cause, which was filed on <u>MARCH 2, 2016</u> in the <u>419TH JUDICIAL DISTRICT COURT</u> of Travis County, Austin, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, March 02, 2016.

REQUESTED BY:
ANTHONY FRED CICCONE
KIESTER, LOCKWOOD & CICCONE, L.L.P.
611 W. 14TH STREET, SUITE 100
AUSTIN, TX 78701-1725
BUSINESS PHONE:(512)477-5796  FAX:(512)477-5821

Velva L. Price
**Travis County District Clerk**
**Travis County Courthouse**
**1000 Guadalupe, P.O. Box 679003 (78767)**
**Austin, TX 78701**

PREPARED BY: RUBEN TAMEZ

-- - -- - -- - -- - -- - -- **R E T U R N** -- - -- - -- - -- - -- - -- - --

Came to hand on the _____ day of _____, _____ at _____ o'clock ____M., and

executed at _____ within the County of

_____ on the _____ day of _____, _____, at _____ o'clock ____M.,

by delivering to the within named _____, each

in person, a true copy of this citation together with the <u>PLAINTIFFS ORIGINAL PETITION, LAWYER</u>

<u>REFERRAL</u> accompanying pleading, having first attached such copy of such citation to such copy of

pleading and endorsed on such copy of citation the date of delivery.

Service Fee: $ _____

Sworn to and subscribed before me this the

_____ day of _____, _____.

Sheriff / Constable / Authorized Person

By: _____

AUSTIN PROCESS, LLC
Printed Name of Server 909 NEUCES
AUSTIN, TX 78701

_____ County, Texas

_____
Notary Public, THE STATE OF TEXAS

**D-1-GN-16-000907**                    SERVICE FEE NOT PAID                    **P01 - 000038222**

☐ Original        ☐ Service Copy

# AFFIDAVIT OF SERVICE

**State of Texas**                    **County of Travis**                    **419th Judicial District Court**

Case Number: D-1-GN-16-000907

Plaintiff:
**Daryl Nutt**

vs.

Defendant:
**Texas Farmers Insurance Company**

For:
Kiester Lockwood & Ciccone, LLP
611 W 14th St
Ste 100
Austin, TX 78701

Received by Austin Process LLC on the 17th day of March, 2016 at 8:44 am to be served on **Texas Farmers Insurance Company by serving Chris Granger, 15700 Long Vista Drive, Austin, TX 78728.**

I, Tim Ramsey, being duly sworn, depose and say that on the **17th day of March, 2016 at 9:42 am, I:**

served a **CORPORATION** by delivering a true copy of the **Citation and Plaintiff's Original Petition** with the date and hour of service endorsed thereon by me, to: **Julie Huerta** as **Authorized Agent**, at the address of: **15700 Long Vista Drive, Austin, TX 78728,** and informed said person of the contents therein, in compliance with state statutes.

I certify that I am over the age of 18, of sound mind, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was delivered. The facts stated in this affadavit are within my personal knowledge and are true and correct.

I, VELVA L. PRICE, District **Clerk,**
Travis County, Texas, do hereby certify that this is
a true and correct copy as same appears of
record in my office. Witness my hand and seal of
office on _March 31, 2016_

**VELVA L. PRICE**
**DISTRICT CLERK**
**By Deputy:**

Subscribed and Sworn to before me on the 17th day
of March, 2016 by the affiant who is personally known
to me

**NOTARY PUBLIC**

NICOLE M. HYBNER
Notary Public
STATE OF TEXAS
My Comm. Exp. Aug. 09, 2016

**Tim Ramsey**
SCH-11266, Exp. 12/31/17

**Austin Process LLC**
**809 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: MST-2016001906
Ref: Daryl Nutt

Copyright © 1992-2011 Database Services, Inc. - Process Server's Toolbox V6.5n

